333 So.2d 649 (1976)
Giselle BROWN and Lorance Evans
v.
Alexander ZITO et al.
No. 7526.
Court of Appeal of Louisiana, Fourth Circuit.
June 9, 1976.
Charles J. Ferrara, Metairie, and Edward P. Comeaux, New Orleans, for plaintiffs-appellees.
Law Office of Emile L. Turner, Jr., (Emile L. Turner, Jr.), New Orleans, for defendants-appellants (The Hertz Corp. and Alexander Zito).
*650 Sessions, Fishman, Rosenson, Snellings & Boisfontaine (James Ryan III), New Orleans, for intervenor-appellee (State Farm Mut. Auto. Ins. Co.).
Before STOULIG, SCHOTT and BEER, JJ.
SCHOTT, Judge.
Defendants, Alexander Zito and The Hertz Corporation have appealed from a judgment in favor of plaintiffs for damages for personal injuries sustained by them in an automobile accident which occurred on December 6, 1973, in New Orleans, and in favor of State Farm Automobile Insurance Company which intervened to enforce subrogation. By consent before trial the suit was dismissed by plaintiffs against defendant Automobile Club of Southern California. Although liability was contested at the trial the only questions raised by defendants on appeal are as to the amounts of the awards to the two plaintiffs and the intervenor's right to subrogation.
Plaintiffs both consulted Dr. Sam C. Macaluso, a general surgeon on December 7, 1973, and were both discharged from treatment on March 13, 1974, after five examinations and 25 diathermy treatments for each. They both saw the doctor on the same dates for the stated reason that this was a matter of convenience to them.
As to Brown, Dr. Macaluso diagnosed a moderate lumbar sprain for which he prescribed muscle relaxants and restricted activities in addition to the diathermy treatments. On January 28, 1974, he found that she had muscle spasms. When he next saw her on March 13, after intervening diathermy treatments, she had no spasms and was released from further treatment.
As to plaintiff Evans, Dr. Macaluso diagnosed both lumbar and cervical sprains for which he prescribed muscle relaxants, pain relievers and restricted activities in addition to the diathermy treatments. Evans, like Brown, was found to have muscle spasms on January 28, but they were no longer present on the next examination on March 13.
Brown testified that she discharged herself from Dr. Macaluso's treatment because she felt that he had done as much for her as he could but that she was still hurting at the time of the trial, which prompted her to see a chiropractor one month before the trial.
Evans testified that he went back to work as a millwright immediately after the accident but was given light duties by his employer for one month. He likewise discontinued seeing Dr. Macaluso because he felt that the doctor had done as much for him as possible, but shortly after his discharge he began seeing a chiropractor because of continued difficulties.
The trial judge awarded to Brown $3700 and to Evans $4800, with $2400 allocated to each of the lumbar and cervical sprains. He commented that he was impressed with both plaintiffs and with Dr. Macaluso and explained that he awarded only $2400 for each sprain to Evans as opposed to $3700 to Brown because he classified Evans' sprains as mild and Brown's as moderate.
The thrust of defendants' argument is best illustrated by the following quotation from the brief filed by their counsel in this Court:
"This record is devoid of much of the circumstances which took place on the day of trial. After several extended pretrial conferences, the case could not be settled, even for the amounts recommended by the lower court. This set the stage for the demeanor of the court throughout the trial.
"The record will reflect several exchanges between the court and counsel of appellants. It is unfortunate, but not all comments of the court, some derogatory in nature, were recorded. At one point during cross-examination, the court *651 yelled a commentary befitting of its attitude and thinking. There is no doubt in this writer's mind that the foundation was laid throughout this record to punish the defendant, The Hertz Corporation, for failing to settle.
"Looking at the injuries sustained, the length and type of treatment, the mere concidence of each having the same number of treatments, examinations, complaints at the time of discharge and the use of chiropractors thereafter, the awards are punitive in nature and grossly excessive."
In oral argument counsel for defendants again contended that the awards were punitive because of his clients' failing to settle the cases.
Although there were some rather pointed exchanges between the court and counsel during the trial these are insufficient to support the serious charge which counsel makes. It is said that many of the statements made at the trial do not appear in the transcript but we are unable to decide cases beyond the four corners of the record. If the record supported counsel's charge there would be a basis for us to remand and order a new trial, but we cannot take this action on the basis of what is before us.
In conclusion, we are unable to say that the awards constitute an abuse of the much discretion accorded to trial judges in assessing damages for personal injuries.
The judgment in favor of State Farm on its intervention was for $1429, consisting of $836 for automobile damage paid to Brown under the policy insuring against property damage and collision, and $298 and $295 paid to Brown and Evans respectively under the medical payments portion of the policy.
In support of its claim, State Farm filed in evidence subrogation receipts signed by plaintiffs referring to State Farm's policy and expressly subrogating all of their rights to State Farm to the extent of the payments.
Defendants' attack on the subrogation is based on the failure to place in evidence the policy and/or the drafts. Their argument is that the following requirements of LSA-C.C. art. 2160 were not met:
"1. When the creditor, receiving his payment from a third person, subrogates him in his rights, actions, privileges, and mortgages against the debtor; this subrogation must be expressed and made at the same time as the payment." (Emphasis supplied)
In Cooper v. Jennings Refining Co., 118 La. 181, 42 So. 766 (1907), the Court said:
"When article 2160, Civ.Code, says of conventional subrogation that `it must be made at the same time as the payment,' it does not mean that the agreement of subrogation cannot be entered in before, or in anticipation of, the payment, but simply that it cannot be entered into after the payment.... The reason why it cannot be agreed to after the payment is that the debt is then extinguished, and can no longer be the subject or basis of an agreement."
Thus, defendants' somewhat novel argument is that in the absence of the policy there is no proof that plaintiffs were required to subrogate along with the other rights and obligations assumed by the parties to the contract and in the absence of the drafts there is no proof that they were not paid before the subrogation receipts were signed, in which case there might be no consideration given for the subrogation. Expressed in another way, if the payments were made solely in consideration for the premiums paid but without any contractual obligation on plaintiffs' part to subrogate no consideration was given by State Farm for its right of subrogation and the contract of subrogation cannot stand.
*652 Undoubtedly, the far better procedure would have been for State Farm to place in evidence its policy and cancelled drafts, but this deficiency is not fatal to its case. The testimony and exhibits compel the conclusion that the policy provided as usual for subrogation. State Farm's adjuster testified as to how he investigated the loss and arrived at a value of Brown's automobile. Photographs of the vehicle taken by him, a bill for wrecker service, a "total loss settlement report" completed by him referring to Brown as the "Policyholder" and the subrogation receipts were received in evidence without objection. Brown testified that she was covered for "everything" including medical pay and collision insurance by State Farm and that following the loss she was paid $860 for the loss of her car and $313 for her medical payments, and she identified the subrogation receipts which she signed.
This testimony also indicates the probability that the drafts and receipts were exchanged simultaneously. Furthermore, the wording of the receipts is that "for the consideration aforesaid and to the extent of said payment the undersigned further subrogates to said company ..." clearly connoting that the exchange of draft and receipt occurred simultaneously and that the parties both acknowledged that the subrogation was supported by consideration.
Finally, defendants' argument was specifically rejected in Stephens v. Dore, 281 So.2d 889 (La.App.2nd Cir. 1973).
Accordingly the judgment appealed from is affirmed at defendants' cost.
AFFIRMED.
BEER, Judge (dissents).
I respectfully dissent, for I am unable to sign an affirmation of that portion of the opinion which awards damages to Giselle Brown and Lorance Evans in the amounts of $3,700 and $4,800, respectively.
I disagree with the majority conclusion that the record is insufficient to support the contentions set forth by counsel for Hertz Corporation.
Just a few examples of what took place in this trial are noted:
(1) When counsel for Hertz Corporation sought to challenge the alleged qualifications of a police patrolman who sought to testify as an expert in accident investigation, the court caustically observed: "Turner wants to play the whole game." Moments later, in response to counsel's continuing objection, the court observed: "I am sure if we had a Hertz guy here, you wouldn't be objecting."
(2) During an exchange between counsel for Hertz Corporation and plaintiff Evans, there was some repartee which could have been material, touching on the question of whether or not Evans had gone to bed and to sleep in his apartment on the night following the accident. When counsel asked a question seeking to clarify the fact that Evans had gone to bed and to sleep, the court observed: "I don't know what he is going to do in bed unless have intercourse."
(3) After various instances where the court took over the questioning with respect to the injuries allegedly suffered by Mr. Evans, the court observed: "What you should have done was stayed home for three months and then they will say you were hurt; you shouldn't have been too honest; you should have stayed home." This statement was soon followed by: "... you should have stayed home for three months and fooled around, making out all this. That is what you should have done and they wouldn't be asking these questions, see. The mistake you made was being honest and going to work and trying to hustle."
Various efforts of counsel for Hertz Corporation to see that the record was complete in order to form a proper basis *653 for the relief he now seeks caused the court to respond: "Let the record reflect that counsel for Hertz is sort of indicating to the Court that it feels like it is like down in the old days in Plaquemines Parish where he is wanting to make a record for the Fourth Tribunal to review."
The record reflects various examples of the deterioration of the proceedings and, when considered as a whole, indicates the lack of judicious impartiality so necessary for there to be a fair hearing.
Necessarily considering quantum of the awards in this light and taking in account the other factors that result in the ultimate determination of whether or not there has been an abuse of discretion, I am obliged to conclude that there has been.
For the impartial trier of the factsto whom we are mandated to accord "great discretion" in setting quantumto remark to a plaintiff testifying in his own behalf that he should, in fact, have calculated to deceive the defendant and that he was mistaken in being honest describes a situation more devastating than the remark itself. It describes a courtroom climate unsuitable for the judicious resolution of disputes and, in my opinion, effectively destroys the presumption that "much discretion" is being brought to the deliberations. It is manifest that error will be committed under such circumstances.
Having concluded that the trial court has, in this instance, forfeited its entitlement to the presumption of much discretion and also being of the view that the awards are manifestly erroneous, I would reduce them to $1,500[1] in each instance.
NOTES
[1] Query: When an intermediate appellate court concludes that a trial court has failed to exercise discretion in quantum awards, should that court conclude "au bout du compte" that a blank has been created into which it must insert its own quantum determination? Recent pronouncements by the Supreme Court in Gonzales v. Xerox, 320 So.2d 163 (La., 1975), and Couto v. Oms, 323 So.2d 128 (La., 1975), would seem to indicate an answer in the affirmative.

Further query: Is discretion breached by way of percentages or by way of dollar amounts, or in both ways? Is the abuse just as needful of correction when the trial court awards $4,800 to compensate a $1,500 injury as when it awards $100,000 to compensate a $30,000 injury? Such errors should, I believe, be corrected in either instance just as, conversely, they must be corrected when they signal a clear abuse by being far too low, regardless of whether it is a "big" case or a "little" case.